UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. **23-80044-CR-ROSENBERG/REINHART**

18 U.S.C. § 371
18 U.S.C. § 982

UNITED STATES OF AMERICA

v.

JENNIFER ROBERTS,

          Defendant.
_____/

## INFORMATION

The United States Attorney charges that:

### GENERAL ALLEGATIONS

At all times material to this Information:

#### Medicare Program

1. The Medicare Program ("Medicare") was a federally funded program that provided free or below-cost health care benefits to certain individuals, primarily the elderly, blind, and disabled. The benefits available under Medicare were governed by federal statutes and regulations. The United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare and Medicaid Services ("CMS"), oversaw and administered Medicare. Individuals who received benefits under Medicare were commonly referred to as Medicare "beneficiaries."

2. Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).

3. Medicare covered different types of benefits and was separated into different program "parts." Medicare "Part A" covered, among others, health services provided by hospitals, skilled nursing facilities, hospices, and home health agencies. Medicare "Part B" covered, among other things, medical items and services provided by physicians, medical clinics, laboratories, and other qualified health care providers, such as office visits, minor surgical procedures, and laboratory testing, that were medically necessary and ordered by licensed medical doctors or other qualified health care providers.

4. Physicians, clinics, laboratories, and other health care providers (collectively, "providers"), that provided services to beneficiaries were able to apply for and obtain a "provider number." A provider that received a Medicare provider number was able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries.

5. A Medicare claim was required to contain certain important information, including: (a) the beneficiary's name and Health Insurance Claim Number ("HICN"); (b) a description of the health care benefit, item, or service that was provided or supplied to the beneficiary; (c) the billing codes for the benefit, item, or service; (d) the date upon which the benefit, item, or service was provided or supplied to the beneficiary; and (e) the name of the referring physician or other health care provider, as well as a unique identifying number, known either as the Unique Physician Identification Number ("UPIN") or National Provider Identifier ("NPI"). The claim form could be submitted in hard copy or electronically via interstate wire.

6. When submitting claims to Medicare for reimbursement, providers were required to certify that: (1) the contents of the forms were true, correct, and complete; (2) the forms were prepared in compliance with the laws and regulations governing Medicare; and (3) the items and services that were purportedly provided, as set forth in the claims, were medically necessary.

7. Medicare claims were required to be properly documented in accordance with Medicare rules and regulations. Medicare would not reimburse providers for claims that were procured through the payment of kickbacks and bribes.

8. Payments under Medicare Part B were often made directly to the provider rather than to the patient or beneficiary. For this to occur, the beneficiary would assign the right of payment to the provider. Once such an assignment took place, the provider would assume the responsibility for submitting claims to, and receiving payments from, Medicare.

### Genetic Testing

9. Various forms of genetic testing existed using DNA sequencing to detect mutations in genes that could indicate a higher risk of developing certain diseases or health conditions in the future. For example, cancer genetic ("CGx") testing used DNA sequencing to detect mutations in genes that could indicate a higher risk of developing certain types of cancers in the future. CGx testing was not a method of diagnosing whether an individual presently had cancer.

10. Medicare did not cover diagnostic testing that was "not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A). Except for certain statutory exceptions, Medicare did not cover "examinations performed for a purpose other than treatment or diagnosis of a specific illness, symptoms, complaint or injury." 42 C.F.R. § 411.15(a)(1). Among the statutory exceptions covered by Medicare were cancer screening tests such as "screening mammography, colorectal cancer screening tests, screening pelvic exams, [and] prostate cancer screening tests." *Id.*

11. If laboratory testing was necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, Medicare imposed additional

3

requirements before covering the testing. Title 42, Code of Federal Regulations, Section 410.32(a) provided, "All diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem." "Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary." *Id.*

### Telemedicine

12. Telemedicine provided a means of connecting patients to doctors by using telecommunications technology, such as the internet or telephone, to interact with a patient.

13. Telemedicine companies provided telemedicine services to individuals by hiring doctors and other health care providers. Telemedicine companies typically paid doctors a fee to conduct consultations with patients. In order to generate revenue, telemedicine companies typically either billed insurance or received payment from patients who utilized the services of the telemedicine company.

14. Medicare Part B covered expenses for specified telehealth services if certain requirements were met. These requirements included that: (a) the beneficiary was located in a rural or health professional shortage area; (b) services were delivered via an interactive audio and video telecommunications system; and (c) the beneficiary was in a practitioner's office or a specified medical facility – not at a beneficiary's home – during the telehealth consultation with a remote practitioner.

**The Defendant and Related Individuals and Entities**

15. Best Care Laboratory LLC ("Best Care") was a limited liability company formed under the laws of New Jersey and authorized to provide services in Florida. Best Care was a laboratory that purportedly provided CGx testing to beneficiaries.

16. Lotus Health Telemed, LLC, a corporation organized under the laws of the State of Florida, with its principal place of business at 18268 50th Street, Loxahatchee, Palm Beach County, Florida, and Lotus Health Services, LLC, a corporation organized under the laws of the State of Florida, with its principal place of business at 20771 Simone Drive, Loxahatchee, Palm Beach County, Florida (collectively, and hereinafter, "Lotus Health"), was a telemedicine company that purported to provide telemedicine services, including, among other things, the authorization of CGx tests for Medicare beneficiaries.

17. Company 1 was a limited liability company formed under the laws of Oklahoma, with its principal place of business in Tulsa County, Oklahoma.

18. Individual 1, a resident of Tulsa County, Oklahoma, was the owner, manager, and operator of Company 1.

19. Richard Garipoli, a resident of Palm Beach County, Florida, was the owner of Lotus Health.

20. Defendant **JENNIFER ROBERTS** was a resident of Wheeling, West Virginia, in the Northern District of West Virginia.

**COUNT 1**
**Conspiracy to Solicit and Receive Health Care Kickbacks**
**(18 U.S.C. § 371)**

1. The General Allegations section of this Information is re-alleged and incorporated by reference as though fully set forth herein.

5

2. From in or around October 2018, and continuing through in or around February 2019, in Palm Beach County, in the Southern District of Florida, and elsewhere, the defendant,

**JENNIFER ROBERTS,**

did knowingly and willfully, that is, with the intent to further the object of the conspiracy, combine, conspire, confederate and agree with Individual 1, Richard Garipoli, and with others, known and unknown to the United States Attorney, to commit an offense against the United States, that is, to violate Title 42, United States Code, Section 1320a-7b(b)(1)(A), by soliciting and receiving any remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, in return for referring an individual to a person for the furnishing and arranging for the furnishing of any item or service for which payment may be made in whole and in part by a Federal health care program, that is, Medicare.

### Purpose of the Conspiracy

3. It was a purpose of the conspiracy for the defendant and her co-conspirators to unlawfully enrich themselves by: (a) soliciting and receiving kickbacks and bribes in return for recruiting and referring Medicare beneficiaries, CGx tests, and doctors' orders for CGx tests and other documentation necessary to submit claims to Medicare (collectively, "doctors' orders") to laboratories, including Best Care; (b) submitting and causing the submission of claims to Medicare for CGx tests that laboratories, including Best Care, purported to provide to those Medicare beneficiaries; (c) concealing the payment and receipt of kickbacks and bribes; and (d) diverting kickback proceeds for their personal use and benefit, the use and benefit of others, and to further the conspiracy.

**Manner and Means of the Conspiracy**

The manner and means by which the defendant and her co-conspirators sought to accomplish the object and purpose of the conspiracy included, among other things, the following:

4. **JENNIFER ROBERTS** and her co-conspirators obtained doctors' orders for CGx tests by paying telemedicine companies, including those operating in Palm Beach County such as Lotus Health, illegal kickbacks and bribes for doctors' orders written by doctors contracted with the telemedicine companies, even though those doctors were not treating the beneficiaries for cancer or symptoms of cancer, did not use the test results in the treatment of the beneficiaries, and did not conduct a proper telemedicine visit.

5. **JENNIFER ROBERTS** and her co-conspirators referred beneficiaries, CGx tests, and doctor's orders to laboratories, including Best Care, in exchange for kickbacks and bribes so that the laboratories could submit claims to Medicare for the CGx tests, regardless of whether the tests were medically necessary or eligible for reimbursement by Medicare.

6. **JENNIFER ROBERTS** and her co-conspirators entered into sham contracts with laboratories, including Best Care, that disguised the illegal kickbacks and bribes as payments for hourly marketing services.

7. As a result of their actions, **JENNIFER ROBERTS** and her co-conspirators caused laboratories, including Best Care, to submit claims to Medicare that were procured through the payment and receipt of kickbacks, and Medicare made payments to the laboratories, including Best Care, in at least the approximate amount of $362,600.

8. **JENNIFER ROBERTS** and her co-conspirators used the kickbacks received from the laboratories to benefit themselves and others, and to further the scheme.

## Overt Acts

In furtherance of the conspiracy, and to accomplish its object and purpose, at least one co-conspirator committed and caused to be committed, in the Southern District of Florida and elsewhere, at least one of the following overt acts, among others:

1. On or about June 20, 2018, **JENNIFER ROBERTS**, Company 1, and Individual 1 executed an agreement pursuant to which **ROBERTS** agreed to recruit Medicare beneficiaries for CGx tests in exchange for $300 per "FTE" (Full-Time Equivalent) hour (the "June 2018 Agreement"). Doctor's orders for CGx tests for these Medicare beneficiaries were generated by telemedicine companies in the Southern District of Florida, including Lotus Health.

2. On or about October 23, 2018, **JENNIFER ROBERTS** submitted an invoice to Company 1 for $24,900 for approximately 83 hours of marketing services pursuant to the June 2018 Agreement.

3. On or about October 23, 2018, Individual 1, through Company 1, wired Richard Garipoli, through Lotus Health, approximately $10,000.

4. On or about October 23, 2018, Individual 1, through Company 1, wired **JENNIFER ROBERTS** approximately $24,900.

5. On or about January 10, 2019, **JENNIFER ROBERTS** submitted an invoice to Company 1 for $12,000 for approximately 40 hours of marketing pursuant to the June 2018 Agreement.

All in violation of Title 18, United States Code, Section 371.

## FORFEITURE ALLEGATIONS

1. The allegations of this Information are re-alleged and by this reference fully incorporated herein for purposes of alleging criminal forfeiture to the United States of America of certain property in which the defendant, **JENNIFER ROBERTS**, has an interest.

2. Upon conviction of a conspiracy to commit a violation of Title 42, United States Code, Section 1320a-7b, as alleged in this Information, the defendant shall forfeit to the United States any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense, pursuant to Title 18, United States Code, Section 982(a)(7).

3. If any of the property subject to forfeiture, as a result of any act or omission of the defendant:

   a. cannot be located upon the exercise of due diligence;

   b. has been transferred or sold to, or deposited with a third party;

   c. has been placed beyond the jurisdiction of the court;

   d. has been substantially diminished in value; or

   e. has been co-mingled with other property which cannot be divided without difficulty,

the United States shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p).

All pursuant to Title 18, United States Code, Section 982(a)(7) and the procedures set forth in Title 21, United States Code, Section 853, as incorporated by Title 18, United States Code, Section 982(b)(1).

_____
For MARKENZY LAPOINTE
UNITED STATES ATTORNEY

GLENN S. LEON, CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

_____
For REGINALD CUYLER JR.
TRIAL ATTORNEY
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

v.

JENNIFER ROBERTS,

_____/
Defendant.

CASE NO.:

**CERTIFICATE OF TRIAL ATTORNEY***

**Superseding Case Information:**

New Defendant(s) (Yes or No)
Number of New Defendants
Total number of New Counts

**Court Division** (select one)
- ☐ Miami
- ☐ Key West
- ☐ FTP
- ☐ FTL
- ☒ WPB

I do hereby certify that:

1. I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. §3161.

3. Interpreter: (Yes or No) No
   List language and/or dialect:

4. This case will take 0 days for the parties to try.

5. Please check appropriate category and type of offense listed below:

   (Check only one)
   - I  ☒ 0 to 5 days
   - II ☐ 6 to 10 days
   - III ☐ 11 to 20 days
   - IV ☐ 21 to 60 days
   - V ☐ 61 days and over

   (Check only one)
   - ☐ Petty
   - ☐ Minor
   - ☐ Misdemeanor
   - ☒ Felony

6. Has this case been previously filed in this District Court? (Yes or No) No
   If yes, Judge                          Case No.

7. Has a complaint been filed in this matter? (Yes or No) No
   If yes, Magistrate Case No.

8. Does this case relate to a previously filed matter in this District Court? (Yes or No) No
   If yes, Judge                          Case No.

9. Defendant(s) in federal custody as of
10. Defendant(s) in state custody as of
11. Rule 20 from the                  District of
12. Is this a potential death penalty case? (Yes or No) No
13. Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard? (Yes or No) No
14. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss? (Yes or No) No

By: _____
REGINALD CUYLER, JR.
DOJ Trial Attorney
FLA Bar No.   0114062

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name:**     JENNIFER ROBERTS

**Case No:** _____

Count #: 1

Title 18, United States Code, Section 371

Conspiracy to Solicit and Receive Health Care Kickbacks
* Max. Term of Imprisonment:    5 years
* Mandatory Min. Term of Imprisonment (if applicable):   N/A
* Max. Supervised Release:    3 years
* Max. Fine:  $250,000 or twice gross gain or loss resulting from the offense

*Refers only to possible term of incarceration, supervised release and fines. It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.